UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| SOGUEY ARACELY ARIZA LOPEZ | CIVIL ACTION NO. 22-1053 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| KELLY CHRISTOPHER ASH | MAGISTRATE JUDGE MCCLUSKY |

**MEMORANDUM RULING**

On April 22, 2022, the Petitioner Soguey Aracely Ariza Lopez ("Ariza") filed a "Verified Petition for Return of the Child to Petitioner" claiming that the Respondent Kelly Christopher Ash ("Ash") wrongfully removed and retained their minor son, MCAA,[1] in the United States in violation of the Hague Convention on the Civil Aspects of International Child Abduction, 25 Oct. 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 ("the Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001, et. seq. ("ICARA"). She seeks the immediate return of MCAA to Honduras. On August 1 and 2, 2022, the Court held a bench trial with each party present. After consideration of the evidence and testimony, the Court presents the following findings of fact and conclusions of law[2] and finds that Ariza's request for the return of the child is **GRANTED**.

**JURISDICTION AND VENUE**

The Court has subject matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1331, arising under the Convention and ICARA. ICARA grants state and federal

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2, the name of the minor child has been redacted and his initials "MCAA" are used in lieu of his full name.
[2] Insofar as any finding of fact may be construed as a conclusion of law, the Court adopts it as such, and to the extent any conclusion of law constitutes a finding of fact, the Court adopts it as such.

1

courts concurrent original jurisdiction over such actions, and a petitioner is able to choose state or federal court for their venue. This Court is authorized "to exercise its jurisdiction in the place where the child is located at the time the petition is filed," which the Court determined by a preponderance of the evidence to be Hosston, Louisiana, within the jurisdiction of the Western District of Louisiana, Shreveport Division. See 22 U.S.C. § 9003(b).

**PROCEDURAL HISTORY**

On November 15, 2021, after learning of MCAA's removal from Honduras by Ash, Ariza filed a complaint with the Honduran Public Prosecutor's office reporting her missing child and contacted the Honduran Federal Police. See Record Document 1 at ¶21-22. She again filed a Complaint on November 17, 2021, with the Public Prosecutor's Office alleging Ash falsified documents to remove MCAA from Honduras. See id. at ¶24. That same day, Ariza applied to the Honduran Central Authority under the Convention for MCAA's return to Honduras. See id. at ¶25. The United States Department of State, in January 2022, notified Ash via letter of the application for MCAA's return and requested his assistance in returning the child to Honduras. See id. at ¶27. Ash responded that he was not willing to voluntarily return MCAA. See id. at ¶28.

Ariza filed the instant petition ("the Petition") on April 22, 2022, seeking MCAA's return under the Convention and ICARA. Ariza also filed a Motion for Temporary Restraining Order ("TRO"). See Record Document 4. This Court granted the TRO and prohibited Ash or anyone acting in concert with him from removing the child from the Western District of Louisiana pending a hearing on the merits. See Record Document 6. The Court then scheduled a status conference for May 10, 2022. The Petition, the TRO,

2

the Court's order granting the TRO, and the minute entry setting the status conference were served via U.S. Marshal on April 22, 2022, at Ash's last known address in the district and were received by Ash's mother who resided at the Hosston address. The Court granted an order extending the TRO for an additional two weeks, see Record Document 9, and conducted the status conference. At the conference, the Court set a motion hearing for May 19, 2022, and ordered all parties to be present with counsel. See Record Document 13.

The Court conducted the hearing on May 19, 2022. Ash attended with the child MCAA, and Ariza appeared via zoom with her counsel physically present. The Court appointed counsel for Ash and seized the passport of the minor child before continuing the hearing on the merits until July 18, 2022. The Court reissued the order that MCAA not leave the district and ordered that Ariza be present in person for the July hearing. The Court also required the submission of joint status reports from counsel every two weeks to monitor the child's location and well-being. See Record Documents 26 & 28.

After an additional continuance, the Court held a two-day hearing on the merits of Ariza's petition on August 1-2, 2022. See Record Documents 66 & 67.

**FINDINGS OF FACT**

Based on the evidence and arguments presented, the Court makes the following findings of fact:

1. MCAA is the only child of Ariza and Ash. Ariza is a Honduran citizen and Ash is a United States citizen. MCAA holds dual citizenship.
2. Ariza and Ash never married. Ariza began living with Ash in 2011. They lived together for 6 years in Honduras.

3. MCAA was born in 2012 in Utila, Honduras. Ash is not the biological father of MCAA, but his name appears on the child's birth certificate.

4. Ash moved back to the United States in 2017. He continued to travel to and from Honduras multiple times after permanently moving to the United States. MCAA remained in Honduras during this time.

5. Ash visited Honduras in November 2021.

6. On November 8, 2021, Ash and Ariza entered into a Settlement Agreement ("the Settlement Agreement") in which Ariza was granted full custody of the child and Ash was prohibited from taking the child out of the country without prior authorization from Ariza. See Ex. 6.

7. The Settlement Agreement discontinued the charges of domestic violence Ash filed against Ariza because both parties reconciled outside of court. See id.

8. The Settlement Agreement explicitly authorized Ash to travel with the child to Tegucigalpa, Honduras, on November 9 and 10, 2021, to go to the American Embassy then return to Roaton, Bay Islands. The Settlement Agreement prohibited Ash from removing the child from the country at this time without prior authorization. See id.

9. The Settlement Agreement was signed by both Ariza and Ash in the presence of their attorneys in open court. See id.

10. Ash traveled with MCAA to the capital city on November 9, 2021. By November 11, 2022, Ash had not return to Roatan with MCAA. Ariza had little to no contact with MCAA at this time.

11. Ariza confirmed through the immigration office located at the Tegucigalpa airport, Instituto Nacional de Migracion Honduras, that the child was removed from the country on November 9, 2022.

12. On November 15, 2021, Ariza filed a complaint with the Honduran Public Prosecutor's Office reporting her missing child and his unauthorized removal from the country by Ash. See Ex. 7.

13. Ariza contacted the Honduran police who referred her to the Honduran Directorate for Children, Youth and Family, Instituto Hondureño de la Ninez y la Familia ("INHFA").

14. Ariza received a document purporting to give her authorization for MCAA to leave the country with Ash. See Ex. 8. She also received a document in which she purportedly relinquished all custody rights over MCAA. See Record Document

15. On November 17, 2021, Ariza filed a second complaint with the Honduran Prosecutor's Office alleging the document authorizing MCAA's removal was falsified by Ash. See Ex. 9.

16. On November 17, 2021, Ariza filed a petition for the return of her child with the Honduran Central Authority. See Ex. 10. The Honduran Central authority transferred Ariza's application to the United States Department of State which ultimately located MCAA in Hosston, Louisiana.

17. Ariza filed the instant petition on April 22, 2022.

18. Prior to his removal by Ash in November 2021, MCAA lived his entire life in Honduras. He was enrolled in school and extracurricular activities, and lived with his mother and her partner, Kendall Beymer.

19. Since his arrival in the United States, MCAA has had limited contact with his mother due to Ash's interference.

## CONCLUSIONS OF LAW

1. <u>The Hague Convention and ICARA</u>

Adopted in 1980, the Hague Convention's stated objective is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." Convention, art 1. Participating countries agree to order the return of a child upon a finding that the child was wrongfully removed or retained unless certain exceptions or defenses apply. The Convention is implemented in the United States through ICARA. The provisions of ICARA are "in addition to and not in lieu of the provisions of the Convention." 22 U.S.C. § 9001(b)(2).

Under ICARA, any petitioner seeking the return of a child may commence a civil action in any court that has jurisdiction over the action in the place where the child is located. <u>See</u> 22 USC § 9003. The petitioner bears the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." <u>Id</u>. Specifically, a petitioner must prove:

> (A) in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and
> (B) in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights.

<u>Id</u>. The burden then shifts to the respondent to assert certain affirmative defenses. The respondent's burden of proof is dependent on which defenses are argued.

The Convention and ICARA emphasize that a court's sole focus is whether a child should be returned to their home country for custody proceedings to take place, not what the outcome of those custody proceedings should be. <u>Saldivar v. Rodela</u>, 879 F. Supp.

2d 610, 617 (W.D. Tex. 2012). Both explicitly prohibit a reviewing court from making a custody determination. The Convention functions under the perception that the "best interests of the child are well served when custody decisions are made in the country of habitual residence." Abbott v. Abbott, 560 U.S. 1, 20, 130 S.Ct. 1983, 1995 (2010).

2. Petitioner's Case

To establish a prima facie case, Ariza must prove by a preponderance of the evidence that 1) Honduras was MCAA's "habitual residence" immediately before Ash's retention of MCAA in the United States, 2) she has "rights of custody" over MCAA according to Honduran law, and Ash's retention is in breach of those rights, and 3) Ariza was exercising her custody rights at the time Ash removed the child. See 22 U.S.C. § 9003.

a. The Child's Habitual Residence

The initial analysis for determining a child's habitual residence required a court to only account for the "shared parental intent" for the child. See Larbie v. Larbie, 690 F.3d 295, 310-11 (5th Cir. 2012). Since then, however, the United States Supreme Court has altered the analysis, explaining that a reviewing court should take a "totality of the circumstances" approach to the evaluation. See Monasky v. Taglieri, 589, U.S. __, __,140 S.Ct. 719, 730 (2020). While the parents' shared intent for where the child will reside is considered and weighed heavily, the Court must conduct an overall fact-intensive inquiry. See id.

In the instant matter, the Court's assessment into whether MCAA's habitual residence was Honduras is a short one as the issue is largely undisputed. MCAA was born in Honduras in 2012. Since then, he has lived in Honduras with Ariza until he was

7

removed from the country by Ash. He was enrolled in the third grade at Cadmus Academy, a bilingual school located in Roatan, and he participated in Taekwondo at the Island Tigers Taekwondo School. According to MCAA, he attended church and had many friends his age while living in Honduras.

Ash argues he left Honduras in 2017 with the intention of establishing a home and a place for Ariza and MCAA to come and live as he and Ariza discussed, relying largely on prior messages exchanged between the two over "Whatsapp." See Ex. 15. However, the Court finds that the evidence in support of his argument is lacking. While the two discussed visits to the United States and trips with the child, this is not enough to overcome the weight of evidence pointing to Honduras as MCAA's habitual residence. Prior to his removal, MCAA had never been to the United States, and, since his arrival, he has not been enrolled in school or extracurricular activities and has had very little interaction with anyone outside Ash and Ash's mother. The Court believes Ariza has proven by a preponderance of the evidence that Honduras was the child's habitual residence prior to his removal.

b. Breach of Petitioner's Rights of Custody

Under the Convention, rights of custody include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a). The Convention recognizes rights which "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of" the country of the child's habitual residence. Id. at art. 3.

According to Honduran law, unless a court-ordered custody arrangement exists, the custody of a child is determined by the principles of *patria potestas*, or "parental authority" dictated by the Honduran Family code. See Joya v. Munguia Gonzales, No. 20-236, 2020 WL 1181846, at *5 (E.D. La. 3/12/2020). In the instant suit, however, Ash and Ariza entered into the Settlement Agreement on November 8, 2021, in which the two, with attorneys present, detailed their custody arrangement. See Ex. 6. The Settlement Agreement explicitly grants sole custody to Ariza and grants certain communication rights to Ash as the father. See id. Furthermore, the Settlement Agreement requires Ariza's consent before MCAA can be removed from the country. See id.

Ash contends that following the parties' meeting and signing of the Settlement Agreement, the two met outside of court and reached an alternative custody agreement. This alternative agreement absolves Ariza of all custody rights over MCAA and vests them with Ash. See Ex. A. Ash underscores that Ariza's signature and his are affixed on the bottom of this document. To further support the validity of this agreement, Ash points to the document in which Ariza granted authority for Ash to remove the child from Honduras on November 8, 2021. See Ex. 8. Ash argues these documents were completed on the same day as the original Settlement Agreement, and, because they are both signed by Ariza, they are the binding custody arrangements in place at the time Ash removed MCAA from Honduras.

However, based on testimony from Ariza's handwriting expert, Peggy Walla, the Court finds that the documents referred to by Ash are forged. There is no seal or notary on the documents, no date, and the documents are completely contradictory to the status quo which had been maintained and put into writing on the same day, just a few hours

9

before Ariza allegedly signed these new documents. The Court agrees with Ariza's expert that Ariza's signatures on Exhibits A and 8 were not made by Ariza and are falsified. Therefore, the Court finds the original Settlement Agreement (Ex. 6) controlled the custody arrangement at the time MCAA was removed, and his removal by Ash without consent was in violation of Ariza's custody over the child.

      c. Petitioner's Exercise of her Rights of Custody

A court's determination of whether custody rights over the child were being exercised at the time of the child's removal is "relatively easy." Larbie, 690 F.3d at 307. In fact,

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child*. Once it determines that the parent exercised custody rights in any manner, the court should stop — completely avoiding the question of whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of federal courts.

Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 345 (5th Cir. 2004) (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1066 (6th Cir. 1996)) (emphasis added).

As previously stated, MCAA lived with his mother in Honduras and was under her care until he was removed by Ash. Ariza was granted sole custody over MCAA in writing by the Settlement Agreement signed by both parties in court. See Ex. 6. Absent any legally permissible evidence from Ash showing that Ariza abandoned her custody rights at any time, the Court finds Ariza has met her burden, proving she was exercising custody rights over MCAA at the time he was removed.

3. <u>Affirmative Defenses</u>

Articles 12, 13, and 20 of the Convention set forth the affirmative defenses available to a respondent who opposes the child's return. A court is not required to order the child's return if a respondent can prove by preponderance of the evidence that:

> (1) more than a year passed from the time the child was wrongfully removed or retained and the child is now settled in the new environment; (2) the petitioner was not actually exercising custody rights at the time of the removal or retention or had consented to or subsequently acquiesced in the removal or retention; or (3) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take the child's views into account.

<u>Joya</u>, at *19, citing Convention, arts. 12 & 13; 22 U.S.C. § 9003(e)(2)(B). Further, a court is not bound to order the return of the child where the respondent proves by clear and convincing evidence that "(1) there is grave risk that return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation; or (2) principles of the country where the child is located post-abduction relating to the protection of human rights and fundamental freedoms do not permit return of the child." <u>Id</u>., citing Convention, arts. 13(b) & 20; 22 U.S.C. § 9003(e)(2)(A).

Ash first argues that Ariza was not exercising custody rights at the time of removal and that she consented or acquiesced to MCAA's removal. He largely relies on the validity of the alternative custody agreement and authorization to remove MCAA from Honduras. <u>See</u> Ex. A & 8. For the reasons previously stated, the Court finds these arguments unsupported. The Court believes these documents are forgeries that completely contradict the status quo which was maintained with the child from the time he was born

11

until Ash removed him from the country. As such, Ash has not met his burden in asserting this defense.

The Court reaches a similar conclusion as to Ash's second argument that the child MCAA objects to leaving the United States and wishes to remain with his father. The Court conducted an *in camera* interview with the child, and, after determining he was of "an age and maturity at which it is appropriate to take the child's views into account," questioned MCAA in the presence of counsel regarding his opinions. 22 U.S.C. § 9003(e)(2)(A). While the child is mature and intelligent, the Court finds that any apprehension the child has towards returning to Honduras has been fostered by Ash in an attempt to keep the child in the United States. Thus, Ash has not met his burden with regard to this defense.

Lastly, Ash contends that MCAA should not return to Honduras because he is in grave risk of serious injury or harm there. The level of harm required for this exception to apply is "a great deal more than minimal." Sanchez v. R.G.L., 761 F.3d 495, 510 (5th Cir. 2014) (quoting Walsch v. Walsch, 221 F.3d 204, 218 (1st Cir. 2000)). "The potential harm 'must be severe,' and there must be a 'probability that the harm will materialize.'" Joya, at *22, quoting Ermini v. Vittori, 758 F.3d 153, 164 (2d Cir. 2014) (citation omitted). Courts, in interpreting the level of threat required, have found the exception applicable when the habitual residence is in a zone of war, famine, disease, or the child would face serious abuse and neglect. Joya, at *8, citing Vasquez v. Colores, 648 F.3d 648, 650 (8th Cir. 2011). Contrarily, the exception was inapplicable in instances where the child would be "return[ed] to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State." Charalambous v.

12

Charalambous, 627 F.3d 462, 468 (1st Cir. 2010) (quoting Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001)).

The Court, in questioning Ash on this defense, found his argument lacking in particularity and legitimacy. Ash could not point to a specific, real risk to the child but instead painted the whole of Honduras as an unsafe place with a bad educational system. While both Ash and Ariza testified to one instance of physical altercation between the two adults, there exists no pattern of violence or harm to MCAA on the part of either parent. MCAA, likewise, could not articulate any harm or threats he faced in Honduras. There also appears to be no concern of "uprooting" the child because, according to the Court's interview with MCAA, he is not enrolled in school in the United States, he does not participate in extracurricular activities, and he has no friends or family other than his father and grandmother present here. Without concrete examples of any danger or threat of the kind contemplated by the affirmative defense, the Court finds Ash has failed to prove by clear and convincing evidence that the child should not be returned to Honduras.

## FEES AND COSTS

Ariza seeks costs and attorney's fees associated with the instant suit. ICARA explains that when a court grants a petition and orders a child be returned to the place of its habitual residence, the court "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be "clearly inappropriate." 22 U.S.C. § 9007(b)(3). The respondent bears the burden of proving the fees and costs are inappropriate. See Kim v. Ferdinand, 287 F. Supp. 3d 607,

631 (E.D. La. 2018). The Court finds that because MCAA must be returned to Honduras, Ariza is entitled to recover attorney's fees, expenses, and costs, unless Ash proves it would be "clearly inappropriate." The amount of the award remains to be determined but shall include the cost of airfare and travel expenses incurred in the return the child.

## CONCLUSION

The Court having determined that the child, MCAA, was wrongfully removed from his place of habitual residence by the respondent, Kelly Christopher Ash, hereby orders MCAA to be returned to Honduras.

Accordingly,

**IT IS ORDERED** that the Verified Petition for Return of the Child to Petitioner (Record Document 1) filed by petitioner, Soguey Aracely Ariza Lopez, be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the child be returned to Honduras in accordance with the Court's previous Order approving the Joint Stipulated Plan for Return of the Child. See Record Document 68.

**IT IS FURTHER ORDERED** that Ash pay Ariza's necessary attorney's fees, expenses, and costs pursuant to 22 U.S.C. § 9007(b)(3). The award of fees, expenses, and costs under § 9007(b)(3) is contingent upon Ariza's filing, within thirty (30) days of the date of this order, an itemization of all fees, expenses, and costs requested and a memorandum detailing the services rendered. See Fed. R. Civ. P. 54(d)(2)(B)(i). This itemization and memorandum must be served on the attorney for the adverse party and filed with the Clerk of Court with a notice of application for taxation. Ash shall have seven (7) days from the date of service of Ariza's itemization and memorandum to file any

objections asserting why he believes the requested award is "clearly inappropriate" under § 9007(b)(3) supported by an affidavit or other evidence. In particular, he shall state his income, any financial assets, necessary expenses, and his out-of-pocket litigation fees and costs associated with this lawsuit. Afterward, Ariza may file a reply memorandum to Ash's objections within five (5) days from the date of service of Ash's memorandum. The Court will then determine the appropriate monetary award of attorney's fees, expenses, and costs.

A separate judgment shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 11th day of August, 2022.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT